## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JUSTIN SHAPIRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: |
| | ) | |
| RESIDENTIAL HOMES FOR RENT, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| d/b/a SECOND AVENUE GROUP, and | ) | JURY DEMAND |
| MICHAEL ROTHMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Justin Shapiro, for his Complaint against Defendants, Residential Homes For Rent, LLC d/b/a Second Avenue Group ("Second Avenue") and Michael Rothman, alleges as follows:

## INTRODUCTION

1.      Justin Shapiro ("Justin") was working as a senior officer for Second Avenue, reporting directly to the company's Chief Executive Officer, Michael Rothman.  Justin was highly successful in that role, undertaking financial modeling and raising significant amounts of capital for the business and overseeing the business division generating the lionshare of Second Avenue's profits.

2.       In March 2022, Justin was diagnosed with a brain tumor and underwent immediate surgery to remove the mass.  As Rothman stated as Justin was being wheeled into surgery, "Justin has made me so much money.  He'll be back at work in two weeks."

3.      Post-surgery, despite undergoing significant medical treatments, Justin was in fact back at work almost immediately, working to ensure that the company could meet its forecasts.

Justin worked around his medical appointments, including on nights and weekends.

4.      On July 18, 2022, faced with increasing and unrelenting demands from Second Avenue and having just worked on back-to-back weekends at the company's office all the while attending to his medical treatment, Justin requested the paperwork to take a leave pursuant to the Family and Medical Leave Act of 1993.  The Company refused to provide the paperwork or allow him leave, insisting that he keep working and that they would solve the issue by hiring "minions" to help shoulder his workload.

5.      Several weeks later, on August 1, 2022, Rothman told Justin that his life "is going to be terrible" and that he was "important to the business and the people in the business like you."

6.      Nevertheless, on August 25, 2022, Justin unexpectedly received an email from Second Avenue's head of human resources stating that he was being terminated, with no cause given.

7.      After being terminated, while knowing that Justin was undergoing extensive medical treatment, some of which was experimental, the Company delayed providing Justin with required information on COBRA which delayed Justin's ability to continue with his treatments. This was after Rothman provided information about Justin's medical condition to other employees, violating Justin's privacy.

## PARTIES

8.      Justin is an individual conducting business in Cook County, Illinois.

9.      Defendant Second Avenue is a Delaware limited liability corporation that has its executive office in Chicago and its operational headquarters in Tampa, Florida.

10.     Defendant, Michael Rothman ("Rothman"), is an individual residing at 840 North

Lake Shore Drive, Chicago, Illinois.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 USC § 1331 insofar as the complaint raises issues for which federal question jurisdiction exists and under Section 107(a)(2) of the Family and Medical Leave Act of 1993 (29 USC § 2617(a)(2)).

12.     Venue is proper in this District pursuant to 28 USC § 1391(b)(2) because the acts giving rise to this lawsuit occurred in this District.

## BACKGROUND FACTS

13.     Second Avenue is involved in the ownership and property management for single-family homes.  Second Avenue raises capital from various investors, and then buys land and develops single family homes or purchases existing single-family homes which it manages on behalf of investors.

14.     Beginning in 2019, Justin began working for Second Avenue, initially on a consulting basis before becoming a full-time employee, reporting directly to Rothman. Among other responsibilities, Justin was involved in building financial models that were essential to the company's success in addition to helping raise the investor funds needed to propel the company forward and then assisting with managing the ensuing investor relationships.

*Justin's Hospitalization*

15.     On March 14, 2022, Justin was transported by ambulance to Northwestern Memorial Hospital after he began experiencing issues with his balance.  Testing revealed the presence of a mass located on the right side of Justin's brain.  A craniotomy was recommended to be performed immediately, and the following day Justin underwent a 7.5-hour surgery to remove the mass.

16. Rothman was in attendance during Justin's hospitalization. While Justin was being taken into surgery, Rothman exclaimed to others present that "Justin has made me so much money. He'll be back at work in two weeks."

17. During his post-surgical recovery at the hospital, and his subsequent discharge several days later, Justin resumed monitoring work for Second Avenue. Insensitive to Justin's care needs, Rothman emphasized that with the March quarter ending in a matter of days, and the company way behind its operating forecast, he needed investment memos prepared right away to present to Second Avenue's clients to review and consent to before quarter end.

18. Justin, just several days out of the hospital, was reviewing and advising his colleagues about how to prepare and finalize these materials in order to make the company's quarter. Fortunately for the company, the memos were completed, presented, and agreed to by clients, which allowed the company to make up substantial ground toward hitting its projection.

***The workload continues to grow***

19. In April and May, Justin largely resumed his duties at Second Avenue despite recovering from the surgery and interviewing and strategizing with different medical teams regarding the next steps of his treatment plan given his very serious diagnosis. In addition to meeting with different medical professionals to learn their views, Justin coordinated the completion of a substantial amount of additional genetic testing that was needed before pursuing the standard next treatment steps (*i.e.*, chemo and radiation). This work was done to, hopefully, allow for the broadest opportunity set of long-term treatment options for him. Among the work Justin completed in late April and May while undergoing daily chemo and radiation treatment:

- Rothman requested a full update to a very complex spreadsheet Justin had built tracking the construction progress and generating an associated forecast for Second Avenue to earn construction management fees covering homes currently

being overseen by the company after another team member proved unable to do so.

- Responding and assisting members of a Chicago-based institutional real estate investment manager's investment and underwriting teams with their modeling questions for the planned, co-branded fund as they worked to finalize their investor marketing materials before going to market. This included finalizing market allocations and their assumptions.

- Continuing oversight of Second Avenue's Build-to-Rent division including construction activity and land sourcing while directly interfacing with many of its builder relationships.

- Serving as a key point of contact for Second Avenue's existing investor clients to reach regarding their portfolio construction, cash needs, and market intelligence questions.

- Providing Second Avenue's acquisitions team with historical, scraped, institutional rental data and analysis from the company's database.

- Managing the build-to-rent underwriting templates used by the acquisitions team for land sourcing and the preparation of the requisite investment memos presented to clients.

***Justin is being forced to work nights and weekends while undergoing treatment***

20.     In June, with the second quarter's end approaching and public homebuilders feeling a demand pinch from retrenching retail buyers impacted by rising mortgage rates, a Houston-based publicly traded national homebuilder began increasing the volume of discounted home acquisition opportunities being presented to the company. Rothman, with Justin's key assistance, had directly helped secure a relationship with this company for Second Avenue in 2021. Now, seeing an opportunity to purchase new homes, in good MSAs, at a discount, with very limited cash needs until home delivery, Second Avenue began aggressively trying to negotiate the purchase of these homes in a number of the national, publicly traded homebuilder's communities located in Texas to present to its clients ahead of quarter end. To further this initiative, Justin analyzed and reported recent, publicly available profit margin information from

the third-party to the Second Avenue acquisitions team (and Rothman) to inform their pricing negotiations.

21.     Additionally, Justin utilized the database of scraped historical rental data to assist the acquisitions team in their underwriting and validation (in collaboration with the company's newly hired COO, Ray Barrows) that there was reason to believe a "rental premium" existed for community rental homes versus non-community rental homes on scattered sites.

22.     Once a price was negotiated and purchase contract entered into, Justin was tasked with preparing underwriting models and associated financial forecasts for more than fifteen unique home specs in three communities that Second Avenue had agreed to purchase.

23.      Once he completed the relevant financial pro-formas for these homes, Justin prepared five sets of the standard, 12–15-page client investment memos complete with updated economic and demographic information about each of the markets where these homes were located.  Citing the urgency to get these memos to clients ahead of quarter-end, Justin worked all weekend in Second Avenue's office despite being on a 30-day break following the completion of his six-week chemo and radiation protocol, in order to finish these memos to deliver to clients in time for month-end.  Justin finished these memos, and they were presented and signed off on by clients (with some additional modifications requested to accommodate certain clients) and the company managed to save its second quarter. To promptly provide these changes to the investment memos for clients, Justin worked again the weekend of July 1 in Second Avenue's office while doing his follow up, five-day chemo protocol. He successfully finalized the memos, which were then provided to clients early the following week.

***Justin requests FMLA paperwork to attend to his health needs, but the company refuses***

24.     Following the described back-to-back weekends of work from Second Avenue's

office, and the unrelenting demands from the company, on July 18, 2022, Justin had no choice but to email Second Avenue's human resources head to request his FMLA paperwork to increase his ability to attend to his serious ongoing health issues. The human resources head did not respond to the email, but Justin received a call from Second Avenue's CFO, Diane Rittmanic, a colleague who told him the company didn't believe it was subject to FMLA but was "hiring up" so that he had "minions" to help shoulder his workload.

25.     Justin had previously told Rothman several times that he had health issues to attend to, but the workload never seemed to lighten. Additionally, anyone hired to help Justin would require training, which would take time and not alleviate the immediate need.

26.     On August 1, 2022, during a telephone conversation, Rothman told Justin among other things that his life "is going to be terrible (implying it was also basically over)." He mentioned the continuation of Justin's work at Second Avenue despite the circumstances and observed: "You're important to the business and the people in the business like you."

27.     After this conversation, Justin began focusing nearly exclusively on attending to his health. It was apparent from text messages received from several of Justin's colleagues that Rothman had shared the news that Justin was attending to his health. At this time, Justin also coordinated the continuity of different weekly meetings he headed so that they were run by the appropriate team member in his absence. Justin also reviewed investment memos prepared by team members on his behalf and offered his thoughts and suggestions.

***Justin is unexpectedly fired and his insurance is dropped***

28.     On August 25, 2022, Justin unexpectedly received an email from Second Avenue's human resources head stating that he was being terminated and without any cause cited. The manner in which the news was executed came as a surprise in light of everything he

had done for the company, even in view of his serious illness.  Making the situation worse was the impact to Justin's health insurance, which was of critical importance given his need for the ongoing treatment of his illness.

29.     On August 31, 2022, after meeting with doctors and obtaining their consent, Justin ordered an FDA approved treatment for his disease that required health insurance.  Several days later, in early September, during a visit with Rush University Medical Center, Justin was told his insurance had lapsed on August 31st and he was not covered.

30.     The corporate office for the FDA-approved treatment Justin requested separately called him the first week of September to inform him they couldn't move forward with setting up treatment until his insurance was restored (presumably through COBRA).  Rush's financial counselors confirmed for him that until COBRA was put in place (and he learned the company had 30 days to get the requisite paperwork to him) he was considered by the hospital to be "self-pay".

31.     Meanwhile, access to the FDA-approved treatment remained on hold prompting one of the device manufacturer's reps to describe Second Avenue's conduct with respect to Justin's insurance as "inhumane".  Second Avenue took no particular care with respect to Justin's health insurance coverage despite the human resources head receiving the FMLA paperwork request noting the serious illness and Rothman's knowledge of the exact diagnosis.

32.     The COBRA paperwork arrived just several days ahead of its 30-day deadline, but the detrimental impact to Justin's ongoing healthcare had been made.

33.     On September 2, 2022, Justin submitted a request for his unemployment benefits to the Illinois Department of Employment Security.  Later that month, Justin received notification from IDES that they had denied his claim based on a determination of Misconduct.

This came as a complete surprise because Justin had never been censured, let alone written up, at any point during his tenure at the company.

34.     Justin requested his personnel file from the company documenting the supposed misconduct.  Once the company provided the personnel file (beyond the required seven-day window), it was devoid of any suggestion of misconduct.

35.     Subsequently, legal counsel for the company sent Justin's counsel a listing of dates after the request for FMLA leave on which Justin had supposedly missed meetings or calls.

<u>**COUNT I**</u>
<u>**FMLA INTERFERENCE**</u>

36.     Justin re-alleges paragraphs 1-35 above as if fully set forth herein.

37.     During Justin's employment with Second Avenue, Second Avenue was an employer within the definition of §101(4)(A) of the Family and Medical Leave Act of 1993.

38.     At all relevant times Justin was an "eligible employee" within the definition of §101(2) of the Family and Medical Leave Act of 1993.

39.     At all relevant times Justin was entitled to leave under the Family and Medical Leave Act of 1993.

40.     Justin provided notice of his intent to seek leave under the Family and Medical Leave Act of 1993.

41.     When defendants failed to accommodate Justin's request for leave pursuant to the Family and Medical Leave Act of 1993, and then subsequently terminated him, they interfered with Justin's exercise of his then-current FMLA rights.

42.     As a proximate result of this interference, Justin suffered damages.

WHEREFORE, Justin respectfully requests that this Court enter judgment in his favor and against defendants as follows:

a. Awarding Justin wages, employment benefits, and other compensation lost to him as a result of the interference with his FMLA rights in an amount to be proven at trial, plus pre-judgment and post-judgment interest;

b. Awarding Justin liquidated damages;

c. Reinstatement to his position or in the alternative pay for such a position for a reasonable time into the future;

d. Awarding Justin all legal fees and additional costs incurred in connection with this action; and

e. Awarding Justin such other and further relief as this Court deems appropriate.

## COUNT II
## FMLA RETALIATION

43. Justin re-alleges paragraphs 1-35 above as if fully set forth herein.

44. During Justin's employment with Second Avenue, Second Avenue was an employer within the definition of §101(4)(A) of the Family and Medical Leave Act of 1993.

45. At all relevant times Justin was an "eligible employee" within the definition of §101(2) of the Family and Medical Leave Act of 1993.

46. At all relevant times Justin was entitled to leave under the Family and Medical Leave Act of 1993.

47. Justin provided notice of his intent to seek leave under the Family and Medical Leave Act of 1993.

48. When defendants failed to accommodate Justin's request for leave pursuant to the Family and Medical Leave Act of 1993, and then subsequently terminated him, they retaliated against Justin as a result of his exercising his then-current FMLA rights.

49. As a proximate result of this retaliation, Justin suffered damages.

WHEREFORE, Justin respectfully requests that this Court enter judgment in his favor and against defendants as follows:

      f.      Awarding Justin wages, employment benefits, and other compensation lost to him as a result of the interference with his FMLA rights in an amount to be proven at trial, plus pre-judgment and post-judgment interest;

      g.      Awarding Justin liquidated damages;

      h.      Reinstatement to his position or in the alternative pay for such a position for a reasonable time into the future;

      i.      Awarding Justin all legal fees and additional costs incurred in connection with this action; and

      j.      Awarding Justin such other and further relief as this Court deems appropriate.

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

50.      Justin re-alleges paragraphs 1-35 above as if fully set forth herein.

51.      Rothman as the CEO of Second Avenue engaged in extreme and outrageous conduct directed toward Justin.

52.      As described more fully above, in the aftermath of Justin's surgery and while ongoing medical treatment, Rothman increasingly placed job-related demands on Justin which failed to account for the time that Justin needed to address his medical needs of which Rothman and the company were fully aware.

53.      Additionally, Rothman violated Justin's privacy rights by providing other company employees with information regarding Justin's medical condition.

54.      Further, the company terminated Justin's health insurance while it knew that he needed the insurance for specialized medical treatments, and then delayed in providing his with information regarding his COBRA rights which left him without health insurance and the opportunity to obtain needed medical treatment.  Once Justin was finally able to enroll in COBRA and reinstate his insurance coverage, he learned that the company had previously enrolled his wife and daughter for insurance coverage (but not him) to which they would not

11

have been eligible other than through Justin.  By taking this action, Rothman and Second Avenue specifically targeted Justin whom they knew needed insurance coverage immediately.

55.     Second Avenue also contested Justin's claim for unemployment benefits, claiming that he had been terminated for misconduct although it never identified any misconduct to Justin and when Justin finally received his personnel file (beyond the statutory-provided time in which it was required to furnish him a copy) that file was devoid of any information that suggested misconduct.  Instead, the company later provided Justin with a list of calls or meetings that it claimed that he had missed in the aftermath of his requesting leave pursuant to the Family and Medical Leave Act of 1993.

WHEREFORE, Justin respectfully requests that this Court enter judgment in his favor and against defendants as follows:

a.     Awarding Justin damages in an amount to be proven at trial, plus pre-judgment and post judgment interest;

b.     Awarding Justin punitive damages; and

c.     Awarding Justin such other and further relief as this Court deems appropriate.

Respectfully Submitted,

**JUSTIN SHAPIRO**

By:     */s/ Steven P. Blonder*
        One of His Attorneys

Steven P. Blonder (6215773)
MUCH SHELIST, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2402
sblonder@muchlaw.com

12

13408225_1